IOWA-DES MOINES NATIONAL BANK & TRUST COMPANY, as Trustee, et al., Plaintiffs, Appellees, v. P. A. DIETZ et al., Defendants, Appellants, CHARLES MURPHY ESTATE et al., Defendants, Appellees.

Nos. 44469, 44471, 44493.

August 5, 1938.

Rehearing Denied December 16, 1938.

Brunk, Janss & Bauch, for appellant P. A. Dietz.

Stull, Lucier & Elmquist, for appellant H. C. Schmitz.

Don E. Neiman, for appellant W. E. Kooker.

Stipp, Perry, Bannister & Starzinger, for appellee Iowa-Des Moines National Bank & Trust Co.

H. N. Rogers, for appellee Carleton D. Beh Company.

J. G. Shifflett, for appellees Henry Krumm and V. G. Preston.

Frank H. Dewey, for appellees H. J. Green and Winifred Turby.

Clifford Powell, for Lucy Murphy, executrix, and Lucy Murphy, appellee.

Howard J. Clark Jr., for appellee Mrs. C. O. Purdy.

Kern & Faville, for appellees Peter Kern and Georgia Howell Coryn.

Royal & Royal, for Jaeger Manufacturing Company, appellee.

Fred A. Little, for appellee Angelina Repplinger.

HAMILTON, J.—The Carleton D. Beh Company, a corporation located in Des Moines, Iowa, was the owner and holder of special assessment certificates issued by various cities and towns of Iowa for the purpose of defraying cost of public improvements, such as paving, sewer, curbing, etc., in the total aggregate amount of $105,078.55. These assessment certificates were payable in annual installments extending over a period of ten years.

Instead of reselling these special assessment certificates to investors, the Beh Company conceived the plan of placing them in a trust and issuing against said trust fund other interest-bearing certificates known and designated as ''Ownership Certificates in Iowa Special Assessment Obligations.'' Accordingly, on October 26, 1929, the Beh Company, as trustor, executed a certain ''Trust Indenture'' transferring and conveying to the Iowa-Des Moines National Bank & Trust Company of Des Moines, Iowa, as trustee, the aforesaid block of special assessment certificates which indenture, among other things, provided that:

''WHEREAS, It is the desire and intention of the Party of the First Part (Carleton D. Beh Co.) to sell to various persons or corporations an interest in and to all of the said Special Assessment Certificates, such interest aggregating the sum of $100,000 to be evidenced by Certificates of Ownership in Iowa Special Assessment Certificates to be issued by the Company and to be in form and recital substantially as follows:

UNITED STATES OF AMERICA
STATE OF IOWA
COUNTY OF POLK
CARLETON D. BEH COMPANY
OWNERSHIP CERTIFICATE
IN
IOWA SPECIAL ASSESSMENT OBLIGATIONS

No..............C                    $...............

CARLETON D. BEH COMPANY does hereby certify that the owner hereof is the owner of an interest hereinafter more particularly described in and to $105,078.55 face value Iowa Special Assessment Certificates, heretofore assigned and delivered to the Iowa-Des Moines National Bank & Trust Company, of Des Moines, Iowa, as Trustee, under a certain Trust Indenture dated as of the first day of September, A. D. 1929.

From the proceeds of the said Special Assessment Obligations, the holder hereof is entitled to participate to the extent of the sum of.........................Dollars ($........) lawful money of the United States of America, payable on or before the First Day of June, 19...., in the manner provided in the Trust Indenture above referred to, with interest at the rate of Five per centum per annum, payable annually on the First Day of June in each year, upon presentation and sur-

render of this certificate and the interest coupons hereto attached, each as they severally mature, both principal and interest hereof being payable at the Des Moines National Bank & Trust Company, in the City of Des Moines, Iowa.

This certificate is one of a series of certificates of like tenor, except as to amount and maturity, aggregating $100,000 each of which does certify to the ownership by the holder thereof of an interest in certain Iowa Special Assessment Obligations, from the proceeds of which this certificate is payable, with interest, all as provided in the Trust Indenture above referred to, reference to which is hereby made for a full description of the order of payment and of the rights of the holder hereof and the terms and conditions upon which this Ownership Certificate is issued and held.

In Witness Whereof, the Carleton D. Beh Company has caused this certificate to be executed and the interest coupons hereto attached to be executed by the facsimile signature of Carleton D. Beh, as of the First Day of September, A. D. 1929.

CARLETON D. BEH COMPANY,

By . . . . . . . . . . . . . . . . . . . . . . . . . . ''

(We omit the form of interest coupon and certificate of trustee.)

This block of $100,000 of ownership certificates was designated as series "C"; certificates were issued in denominations of $500 and $1,000 numbered from 1C to 127C; the first $12,000 of which, being numbered from 1C to 15C inclusive, maturing June 1, 1930, and the last $1,000 of which, being numbered 126C and 127C, maturing June 1, 1939. Each of the groups, except the last, contained certificates of both $500 and $1,000 denominations, the idea, undoubtedly, being to have a group of ownership certificates maturing at such time and in such aggregate amount as could be taken care of as the installments were paid on the Special Assessment Certificates.

The trust indenture provided that the special assessment certificates were assigned and transferred to the trustee for the benefit of the holders and owners of the certificates, the trustee to hold said securities and collect the same with the aid and assistance of the trustor and pay over all the money so collected into a special fund from which the ownership certificates were to be paid.

The following sections of said trust indenture relate to the method of payment:

"Section 2. From, and to the extent of, any moneys which may be available in the fund described in Section 1 hereof, the said Trustee does hereby agree to pay the said Ownership Certificates in Iowa Special Assessment Obligations and interest thereon, as they mature, upon presentation of same for surrender and cancellation, it being understood that from said fund that said Trustee may pay any interest coupon or certificate presented to it for payment, such certificate or coupon being at the date of presentation matured and due. All certificates and coupons so paid shall be stamped paid by the trustee and cancelled.

"In the event that at date of maturity of any certificate or coupon the cash funds in the hands of the Trustee available for the payment thereof shall be insufficient to make payment in full, the Trustee shall not be required to make payment pro tanto, or partial payments, and shall only be required to pay when sufficient funds are available for full payment. In the event the funds available at any time are insufficient to pay all certificates and coupons that have matured, the Trustee may pay in the numerical order of the number of such certificates.

"Section 3. The said Trustee does further agree that in the event of there being a cash balance in the said fund, and such balance being sufficient to pay one or more certificates and accrued interest thereon, then, and in that event, it will call for payment upon presentation and surrender, the certificate or certificates next falling due in their numerical order, it being also provided that if at any time the balance available shall be insufficient to pay the next certificate of one thousand dollar denomination in order of number, but sufficient to pay a certificate of five hundred dollar denomination with accrued interest, then the next certificate of five hundred dollar denomination may be called and paid, and the said Trustee shall cause thirty days notice of such intended payment to be given by mail, addressed to the owner or owners thereof at such address as may be shown by the certificate register of the said Trustee provided by Section 4 hereof. * * *

"Section 6. Upon payment of each of the said Ownership Certificates hereinabove referred to, the owner thereof does hereby expressly release all claim, right, title, and interest in and to

any and all moneys, proceeds and avails remaining in the fund described in Section 1 hereof, and all claim, right, title, and interest in and to such of the said Special Assessment Obligations as may be remaining unpaid and uncollected, it being the intention hereof that after the payment of all of the said certificates and accrued interest thereon, the Carleton D. Beh Company shall be entitled to receive all moneys or proceeds as shall be remaining in the said fund, and also such of the said Special Assessment securities as shall be unpaid and uncollected.''

Under this arrangement the Beh Company disposed of the entire $100,000 of ownership certificates to various individuals and corporations and the trustee, proceeding under the trust indenture, from the proceeds collected on the special assessment certificates retired ownership certificates 1C-76C, inclusive, totaling $61,000 principal as they matured to June 1, 1935, and, in addition, paid all interest on all ownership certificates down to June 1, 1935. It then became apparent, because of the well-known financial depression resulting in failure to make payment of taxes and special assessments throughout the state, that there was going to be a deficiency; that is, the properties against which the special assessment certificates had been issued were going to tax sale and the trust fund was being thereby depleted and there would not be sufficient funds with which to pay in full the outstanding matured and unmatured ownership certificates together with interest thereon. This impairment in the trust account called for action on the part of the trustee and the trustee, accordingly, instituted this suit in equity asking the court for instructions as to the trustee's duty under the trust indenture and ownership certificates with reference to the priority in the distribution of the funds in the trust account. The owners of the outstanding ownership certificates were made parties and brought into court and some of them answered and others made default.

Defendants P. A. Dietz, H. C. Schmitz, and W. E. Kooker, holders of the ownership certificates first maturing, contended that they were entitled to a preference or priority over holders of other certificates maturing at a later date and that the funds in the hands of the trustee should be first applied in full payment of the certificates first maturing; whereas, the holders of some of the certificates maturing at a later date contended that,

due to the fact that the trust fund was insolvent, a receiver should be appointed to take charge of said trust fund and marshal the assets and pay out the same pro rata upon all the unpaid outstanding ownership certificates, irrespective of the date of maturity thereof.

The trial court found that the trust assets remaining in the hands of the trustee were and would be insufficient to pay in full all of the remaining unpaid ownership certificates; that the trust estate should be placed in receivership and, henceforth, be administered by a receiver appointed by the court and that the Iowa-Des Moines Bank & Trust Company would be a proper institution to act as receiver of the trust estate; that, in view of the insufficiency of the trust assets to pay in full all of the unpaid ownership certificates outstanding in the order of number and maturity, such beneficial ownership certificates were entitled to share equally in the trust assets on a pro rata basis and judgment was entered accordingly. Thereafter, the trustee made its final report and was discharged. Certain objections were made by the appellants which were overruled and defendants P. A. Dietz, H. C. Schmitz, and W. E. Kooker have appealed from all adverse rulings of the trial court.

The decision of the case hinges on the one question, namely, Was the trial court right in applying the pro rata rule to all outstanding ownership certificates without regard to their numerical designation or date of maturity? The question is not of easy solution. There are no legal precedents to light up our pathway. The trust indenture in its terms and conditions is apparently so novel as to be without a counterpart or parallel. It stands alone and may not rightly be classified either as a mortgage or a pledge of collateral as it lacks some of the attributes of the former and contains more than is necessary to constitute the latter. The ownership certificates are somewhat analogous to shares of stock in a company or association. They recite that "owner hereof is the owner of *an interest * * * in and to* $105,078.55 face value Iowa Special Assessment certificates * * *." (Italics ours.) The ownership certificates provided for therein are not guaranteed by anyone and the instrument is so drawn that there is no personal liability on either the trustor or the trustee. It is plainly stated in the instrument that the $105,078.55 of assessment certificates are conveyed and transferred to the trustee so that the holders of the ownership certifi-

cates might be secured in their ownership therein and that the holder of ownership certificates is entitled to participate in the proceeds derived from the collection of assessment certificates to the extent of the face value of the ownership certificate held by him payable on the date of maturity in the manner provided by the trust indenture. Each ownership certificate states on its face that it is one of a series of certificates of like tenor except as to amount and maturity aggregating $100,000. Therefore, the purchaser of any one of the $100,000 worth of certificates took the same with notice that there was to be issued a total of $100,000 of like certificates containing certain serial numbers all bearing the same date, drawing the same rate of interest, secured and backed by a common fund and payable from no other source.

Assessment certificates are collected through the office of the county treasurer. Statutory provision is made for enforcing payment, by means of tax sales, in the event of failure to pay such special assessments. The evidence shows, and it is not disputed, that some of the property against which the special assessment certificates had been issued had been sold for taxes and tax deeds had been executed, other properties had been sold but deeds had not yet been executed. The exact amount which might ultimately be recovered from the assessment certificates is not shown and the evidence as to the insolvency of the fund is not of the most satisfactory kind but there is no evidence in support of its solvency and no claim made in argument that the fund is solvent and we are satisfied the trial court was right in finding that the security was inadequate to pay principal and interest of the remaining outstanding ownership certificates and that the fund was, therefore, insolvent and, under the showing made with reference to the failure to pay the special assessment taxes and there being no specific provision in the trust indenture relative to such matters, that the trust fund was in such jeopardy as to warrant the appointment of a receiver with power and authority under the order of the court to do whatever was legal and proper in the premises to preserve and protect the trust fund in the interest of the beneficial owners thereof. It thus being necessary, on account of this insolvent condition, to place this whole matter in receivership and, since, under the terms of the trust indenture, the holders of ownership certificates had a common interest in the entire trust fund, equity and good

conscience would seem to dictate that, inasmuch as there would be insufficient funds to pay all the remaining outstanding certificates, the proceeds should be applied pro rata.

This conclusion finds support in the case of Central State Bank v. Commercial Building & Securities Co., 206 Iowa 75, 218 N. W. 622, in a well-considered opinion written by Judge Albert. This case is not exactly parallel with the one at bar. After reviewing and discussing the rule applied to real estate mortgages that where a series of notes bearing different due dates are secured by one mortgage on real estate the note first maturing has priority (and appellants contend this rule should be applied in the case at bar), the court finally concludes as follows (page 82 of 206 Iowa, page 625 of 218 N. W.) :

"It is our conclusion that the intent and purpose of this system of financing was to put all the bondholders on a parity, and there can be no question in our minds that each of the bondholders believed and understood that his rights were equal in the security in the hands of the trustee, and we so conclude. Under the application of the well-known equitable doctrine that 'equality is equity,' we hold, under the terms of the trust indenture and the intention of the parties, that all of the bondholders are equally interested in the proceeds of the securities in the hands of the trustee, and that it should be divided among them pro rata. The situation of these bondholders, to our minds, is not the same as the situation of one who purchases one of a series of notes secured by a real estate mortgage, and, therefore, the rules governing such real estate mortgage securities should not be applied to the case at bar."

While there are plausible arguments which have been ably presented by appellants in support of the proposition that the mortgage rule should be applied, we are inclined to agree with the trial court's conclusion. As long as the fund was solvent the order of payment of the ownership certificates provided for in the trust indenture was clear and explicit but when the fund became insolvent, a thing apparently not contemplated by the parties at the time, and the whole matter submitted to a court of equity, solution must be found by the application of equitable principles not inconsistent with the legal rights of the parties interested. There can be found in the trust indenture no language indicating an intent to create any preference as between

holders of ownership certificates. All had a common interest in the trust fund in proportion to amount of ownership certificates held by each. The ownership certificates evidenced such interest or share in the common fund; their relation to this fund stands upon a common basis. Had the purpose intended been carried out none would have received more than his proportionate share in the entire fund. Their right to share in this common fund was thus intended to be equal, that is, without preference. Now that misfortune has overtaken the enterprise and the plan and purpose intended has been frustrated through no fault of any of the parties interested, upon what principle of equity is the court justified in allowing a preference? They all paid the same full consideration. We fail to see any meritorious grounds for applying any other rule than that of equality which is equity; where the original intent and purpose was that all should share equally and all stand on equally meritorious grounds, it is but a logical carrying out of this equitable principle to apply the pro rata rule.

Our conclusion finds support in principle in the Building & Loan Association cases in which, in most instances, the courts have refused to allow preference between stockholders even where some held stock which had matured and which, under the by-laws, had the company remained solvent would have been entitled to payment in full. See, Rabbitt v. Wilcoxen, 103 Iowa 35, 72 N. W. 306, 38 L. R. A. 183, 64 Am. St. Rep. 152; McKee v. Savings & Trust Co., 133 Iowa 548, 110 N. W. 908; Pacific Coast Savings Soc. v. Sturdevant, 165 Cal. 687, 133 Pac. 485, 49 L. R. A. (N. S.) 1142. We quote the following pertinent language from the last cited case (page 487):

"The by-laws, in the case at bar, did not assume to give to the holders of matured shares any priority over other shareholders. All had a right to be paid upon withdrawal. The provision that 'matured shares shall be paid in the order of maturity' merely declares the respective right, among themselves, of various holders of matured stock. But, if the clause may be given a broader meaning, it is not to be construed as creating a preference in the distribution of assets where the association is insolvent. The rights of withdrawal 'are provided for with respect to going concerns only.' Reddick v. U. S. Building & Loan Assn.'s Assignee, 106 Ky. 94, 49 S. W. 1075 [20 Ky. Law Rep.

1720]; Hohenshell v. Home Savings & Loan Assn., supra [140 Mo. 566, 41 S. W. 948]."

The decree of the trial court is accordingly affirmed.—Affirmed.

SAGER, C. J., and DONEGAN, MITCHELL, ANDERSON, and STIGER, JJ., concur.